AO 91 (Rev. 11/11)  Criminal Complaint

## UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICHARD SILVA,<br><br>Defendant. | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>JUL 1 8 2019<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                    DEPUTY |

Case No.  **ED19-0373M**

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 24, 2019, in the County of Riverside in the Central District of California, the defendant violated:

18 U.S.C. §§922(g)(1)                     Felon in Possession of a Firearm and Ammunition

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Keith A. Maccalla, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   7/18/19

KENLY KIYA KATO  signed pursuant to Fed R Crim P. 4.1
_____
*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA John A. Balla

## **AFFIDAVIT**

I, Keith A. MacCalla, being duly sworn, declare and state as follows:

### **I.  INTRODUCTION**

1.     I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") since July 2014.  I am currently assigned to the Los Angeles Field Office, Riverside Resident Agency, Violent Crime Squad.  Since August 2015, I have been assigned to the FBI Los Angeles Gang Impact Team ("FBI LA GIT"), a joint federal and state gang task force.  In this capacity, I investigate, among other things, criminal street gangs and the trafficking of narcotics.  I have received specialized training in conducting criminal investigations and have consulted with my colleagues who have many years of experience investigating criminal street gangs and narcotics trafficking.

3.     Prior to working for the FBI, I was a Border Patrol Agent from April 2007 to July 2014.  During this time, I was assigned to investigate human and narcotics trafficking, as well as money laundering.

4.     During my tenure with the FBI, I have participated in investigations of violent crime, drug trafficking organizations, and large-scale street gangs, including investigations that have

involved court-authorized interception of wire and electronic communications.  I have become familiar with the methods, language, structures, and criminal activities of criminal street gangs and drug trafficking organizations operating in and through this judicial district.  I have become familiar with the types and amount of profits made by narcotics smugglers and the methods, language, and terms that are used to disguise the source and nature of profits from illegal narcotic dealings.

5.   As a federal agent, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

## II. PURPOSE OF AFFIDAVIT

6.   This affidavit is made in support of a criminal complaint and accompanying arrest warrant against Richard Silva ("SILVA") for violations of 18 U.S.C. §§ 922(g)(1): Felon in Possession of a Firearm and Ammunition.

7.   This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Riverside Police Department in Riverside, California:

a.   A black Apple iPhone 8 cellular phone, model number A1863, IMEI number 353000093099979 (the "SUBJECT DEVICE").

8.   The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICE that constitutes evidence, fruits, and instrumentalities of violations of 18 U.S.C.

§ 922(g)(1): Felon in Possession of a Firearm and Ammunition
(the "Subject Offense").

9.    The SUBJECT DEVICE is also identified in Attachment A
to the search warrant application.  The list of items to be
seized is set forth in Attachment B to the search warrant
application.  Attachments A and B are incorporated herein by
reference.

10.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested criminal
complaint, arrest warrant, and search warrant and does not
purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

11.   On Thursday, January 24, 2019, officers with the
Riverside Police Department ("RPD") arrested SILVA, a previously
convicted felon, for other active felony warrants.  Officers
searched the vehicle SILVA was driving and found a loaded and
stolen Glock 17 firearm with serial number BGEW159 in between
the center console and the passenger seat.  Before the arrest,
officers had seen a post that SILVA made to his Instagram
account about two months earlier depicting a close-up of him
holding that same Glock with the serial number visible.  The

3

SUBJECT DEIVCE was in SILVA's possession at the time of his arrest and was placed into RPD evidence along with the Glock.

### IV. STATEMENT OF PROBABLE CAUSE

**A.   RPD Officers obtain a tracker warrant to arrest SILVA on an outstanding warrant.**

12.   I learned the following from speaking with RPD officers and reading their associated reports and affidavits:

a.   SILVA is a documented member of the Casa Blanca Vagabundos gang in Riverside, California.  Among other sources, officers know his gang affiliation from their personal contact with SILVA and from monitoring his social media accounts where he makes frequent gang-related posts.

b.   On January 18, 2019, RPD obtained a warrant to install a GPS tracker on a black Kia SUV and monitor its movements for thirty days.  Officers had conducted surveillance, and they saw SILVA driving the Kia a week earlier. Additionally, the Kia was registered to Melissa Anderson, SILVA's known girlfriend, at 10584 Miami Avenue in Riverside. SILVA listed that same address with the DMV.

c.   Officers sought the warrant for three reasons.

i.   First, SILVA had two outstanding arrest warrants on felony charges from Riverside County and San Bernardino County, and officers believed that the tracker would help locate him to execute those warrants.

ii.   Second, while monitoring SILVA's social media posts, officers had seen two Instagram posts from SILVA's account depicting SILVA holding a Glock handgun.  One of the

posts is a video of SILVA with the handgun in his lap while driving a vehicle.  The other post is a close-up photo of the Glock in SILVA's hand with the Glock's serial number visible. Officers believed that the tracker would help them find evidence of SILVA's illegal firearm possession.

        iii. Third, given SILVA's continued gang activity, officers believed that the tracker would help them find evidence of SILVA's gang contacts to support gang-related penalty enhancements on any state charges SILVA may face.

      d.  On January 22, 2019, RPD officers installed the tracker warrant on the Kia.

**B.  RPD Officers arrest SILVA.**

13.  I learned the following from speaking with RPD officers, reading their associated reports, and reviewing their associated dash-cam and body-cam footage:

      1.  <u>SILVA visits a gun range to have a Glock 27 repaired.</u>

      a.  On January 24, 2019, at approximately 12:02 p.m., RPD officers saw the Kia, driven by SILVA, park at the Magnum Gun Range in Riverside.  According to a store employee (as well as a review of surveillance video of the encounter), SILVA and another man entered the store together.  SILVA was carrying a firearm wrapped in a yellow microfiber towel.

      b.  SILVA placed the firearm on the counter and told the employee the firearm was jamming.  The employee noticed that a spring needed to be replaced and completed the repair.  SILVA

paid cash for the part and departed the store.  The employee noted that the firearm SILVA had repaired was a Glock 27.

     c.    After SILVA and the other male left the store, RPD officers saw SILVA drive to a home in Riverside where SILVA and the other male entered.  A short time later, SILVA exited the home by himself and left in the Kia.

          2.    Officers arrest SILVA and find a Glock 17 in the Kia.

     d.    RPD officers continued following SILVA as he drove from the home to his girlfriend's work address, also in Riverside.  After picking up his girlfriend, SILVA drove to the area of the intersection of Anna Street and Arlington Avenue in Riverside and parked the Kia close to an elementary school.

     e.    SILVA exited the Kia, and RPD officers approached and detained him shortly thereafter.  They then conducted a records check and confirmed the outstanding felony arrest warrants.

     f.    After SILVA was placed into the backseat of the RPD vehicle, one of the RPD officers asked SILVA if they could search the Kia to which SILVA replied, "you have the right to search it, so go ahead and search."  During the search, an RPD officer located the following partially concealed in the space between the center console and the front passenger seat:

          i.    a Glock 17 (not a Glock 27) firearm with serial number BGEW159; and

          ii.    a magazine containing nine rounds of 9mm ammunition (three rounds of Hornady 9mm Luger, two rounds of

Federal Cartridge 9mm Luger, two rounds of Jagemann 9mm Luger, one round of Winchester 9mm Luger, and one round of Armscor 9mm Luger) inserted into the Glock 17 firearm.

g.   SILVA's girlfriend was interviewed about the firearm and told RPD officers that she had not been in the vehicle since SILVA dropped her off that morning and that SILVA had just picked her up from work prior to being contacted by law enforcement.  She further stated that she had never seen or touched the firearm found in the Kia.  SILVA was arrested and booked on his warrant.

14.  I have reviewed the Instagram posts contained in the state GPS tracker warrant.  Again, the photo of SILVA holding a Glock also depicts the Glock's serial number.  The serial number matches the serial number on the Glock found inside the Kia.

**C.   Interstate Nexus**

15.  On July 17, 2019, I contacted ATF SA Angie Kaighin, who in turn contacted ATF SA Paul Kirwan, an ATF expert in determining the manufacturer of firearms and ammunition.  I provided SA Kaighin photographs of the firearm and ammunition seized in this case.  Based on the description and the photographs, SA Kirwan determined that the Glock 17 and the ammunition were not manufactured in California and thus, because they were found in California, must have traveled in and affected interstate or foreign commerce.

**D.   SILVA's Felony Convictions**

16.  On July 11, 2019, an RPD officer gave me SILVA's criminal history report.  After reviewing the report, I believe

SILVA has been convicted of the following felonies, on or about the following dates, in the Superior Courts of San Bernardino, San Diego, and Riverside counties:

| Date | Case number | Conviction |
|------|-------------|------------|
| 07/11/2008 | FVA801011 | HS 11377(a) – Possess Controlled Substance |
| 12/09/2008 | RIF142787 | PC 496(a) – Receive/Etc Known Stolen Property |
| 11/12/2009 | RIF153671 | PC 12021(a)(1) – Felon/Etc Possess Firearm |
| 10/05/2010 | RIF10004471 | HS 11378 – Possess Control Substance For Sale |
| 05/11/2012 | SCN305673 | HS 11378 – Possess Control Substance For Sale |
| 06/16/2014 | RIF1406506[1] | HS 11379(a) – Transport/Etc Cntl Sub |
| 02/08/2019 | RIF1605289 | HS 11352(a) – Transport/Sell Narc/Cntl Sub |

---

[1] On July 18, 2019, SA Kaighin obtained a copy of the certified conviction documents for this case which indicate that SILVA was in fact convicted of this crime and sentenced to 5 years in county jail suspended for 3 years in county jail and 2 years of mandatory supervision.

### E.    Prior search of the SUBJECT DEVICE by RPD.

17.   On January 24, 2019, an RPD officer authored and obtained a state search warrant to search the SUBJECT DEVICE. On or about July 16, 2019, an RPD officer who reviewed the data extracted from the SUBJECT DEVICE informed me that the photograph and video posted to SILVA's Instagram account as described above were present on and appeared to be captured by the SUBJECT DEVICE.  The RPD officer also informed me that although a full extraction of the SUBJECT DEVICE was present in RPD's evidence, it is possible that information related specifically to the firearm offenses I am investigating was not segregated from the extraction in RPD's evidence.

18.   To confine the scope of the search to the current firearm investigation, I now request a warrant to search the SUBJECT DEVICE for the items listed in Attachment B.

### V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

25.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms

illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

19.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

26.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

27.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

29.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII.  CONCLUSION

30.  For all the reasons described above, I respectfully submit there is probable cause to believe that SILVA committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition.

31.  Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offense will be found on the SUBJECT DEVICE as described above and in Attachment A.

KEITH A. MACCALLA
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this 18 day of July, 2019.

KENLY KIYA KATO   signed pursuant to Fed. R. Crim P 4.1
UNITED STATES MAGISTRATE JUDGE